# United States Court of Appeals
## For the First Circuit

No. 19-1552

RODERICK TAYLOR

Petitioner, Appellant,

v.

SEAN MEDEIROS,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Howard, Chief Judge,
Lynch and Lipez, Circuit Judges

Dany Allan Curhan for appellant.
Anna Esther Lumelsky, Assistant Attorney General,
Massachusetts Attorney General's Office, with whom Matthew P.
Landry, Assistant Attorney General, Massachusetts Attorney
General's Office, was on brief, for appellee.

December 23, 2020

**LIPEZ**, **Circuit Judge**. Following a nearly eight-week jury trial in Massachusetts state court, Roderick Taylor was convicted of murder in the second degree and sentenced to a mandatory term of life imprisonment. Taylor claims that his trial was fundamentally unfair in violation of his federal constitutional right to due process because the prosecutor made improper statements during his closing argument. Taylor now seeks a writ of habeas corpus on the ground that the Supreme Judicial Court of Massachusetts ("SJC") unreasonably denied this federal constitutional claim.

As the SJC said, certain remarks by the prosecutor "should not have been made." Commonwealth v. Taylor, 14 NE.3d 955, 966 (Mass. 2014). Nonetheless, after a careful review of the record, and applying the standard prescribed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), we conclude that the SJC reasonably applied the clearly established law of the Supreme Court in holding that the improper statements by the prosecutor did not render the trial fundamentally unfair. Thus, we affirm the district court's decision denying the petition for habeas relief.

## A. Factual Background

In July 2006, Taylor was indicted by a grand jury for the murder of Dominique Samuels. He was tried in Suffolk County Superior Court from May 7 through July 3, 2008. We take from the district court the well-stated summary of the government's case:

> The Commonwealth presented credible evidence at trial that Taylor had strangled the victim, Dominique Samuels ("Samuels" or "the victim"), and burned her body in a public park days later. Samuels resided in a multi-bedroom apartment with Martin McCray ("McCray"), McCray's brother, McCray's female cousin and a male friend of McCray. Taylor is McCray's cousin . . . .
>
> On the night in question, April 27 into the early hours of April 28, 2006, Taylor and McCray were in McCray's room, drinking alcohol and playing video games. Around 10:00 P.M., McCray left his apartment to spend the night at his girlfriend's home. Taylor remained in McCray's room.
>
> A number of witnesses recalled hearing screaming that night coming from the victim's apartment. The landlord's daughter testified that she heard two men laughing and dragging something after an altercation. McCray's cousin heard what she initially assumed was a sexual encounter but later believed it to be a woman in distress and then a loud boom. Despite those noises, no one residing inside the building notified law enforcement.
>
> The following morning, Taylor went to the apartment of McCray's girlfriend to see McCray. McCray claimed that Taylor

confessed to killing Samuels at that time and showed McCray scratches on his hands and neck inflicted by Samuels. During the next few days, McCray and Taylor spoke on the phone several times. McCray alleged that Taylor sought access to a vehicle to dispose of Samuels's body. McCray also claimed that Taylor told him that he intended to burn Samuels's fingertips because his skin was underneath her fingernails. McCray testified that at 5:30 A.M. on Sunday, April 30, 2006, Taylor called him to tell him "it's done." Samuels's body was discovered in Franklin Park 30 minutes later.

A search of McCray's room thereafter revealed two distinct bloodstains: one containing the DNA of the victim and one containing the DNA of Taylor.

Taylor v. Medeiros, 381 F. Supp. 3d 110, 113-114 (D. Mass. 2019).

Taylor's defense was that McCray had actually committed the murder. His counsel cross-examined McCray at length about inconsistences in his testimony. When counsel confronted McCray with the charge that he had murdered Samuels, McCray appeared distraught, ran from the courtroom, and collapsed in the bathroom.

The prosecutor gave an approximately sixty-minute closing argument. In urging the jury to find Taylor guilty, the prosecutor characterized the defendant's theory of the case as a "bald-face lie" and told the jurors that if they credited the theory, "you will have violated the oath that you took as jurors." He described defense counsel's cross-examination of McCray as "accusatory, rude, . . . disrespectful, and at times

- 4 -

vulgar."  In referencing the uncertainty concerning Taylor's whereabouts when he made certain incriminating phone calls, the prosecutor commented that only Taylor knew his own location. Toward the end of his closing argument, the prosecutor discussed the DNA evidence against Taylor and stated "[i]t doesn't get any better than that."

Defense counsel objected only to the "jury's oath" comment.  The judge gave an immediate curative instruction, stating, "The jurors will make their decision, as has been stated, from the evidence and the evidence only.  That's what controls."  During the final jury charge, the judge gave additional instructions regarding the jury's duty to evaluate the evidence.

After the jury found Taylor guilty of murder in the second degree, the judge imposed the mandatory life sentence.

## B. Procedural History

Following his conviction, Taylor filed a direct appeal.  He also filed a motion for a new trial, arguing, among other things, that the prosecutor's closing argument was improper.  The trial judge denied Taylor's motion, and Taylor appealed.  The two appeals were consolidated.  The Massachusetts Appeals Court affirmed the denial of the new trial motion and the conviction.  See Commonwealth v. Taylor, 981 N.E.2d 233 (Mass. App. Ct. 2013) (Table).  Taylor appealed to the SJC.  On

August 29, 2014, the SJC issued an opinion affirming Taylor's conviction.  See Commonwealth v. Taylor, 14 N.E.3d 955 (Mass. 2014).

In his appeal to the SJC, Taylor claimed that he should receive a new trial because the prosecutor made improper remarks in his closing argument: specifically, disparaging comments about defense counsel and the defense's theory of the case, the remark invoking the jurors' oaths, a statement commenting on Taylor's failure to testify, and an expression of personal opinion.  The SJC disapproved of two statements: the characterization of the defense's theory as a "bald-face lie" and the statement that it would be a violation of the jurors' oaths if they believed that theory.  Id. at 966.  The court reasoned that these statements were improper because the former implied that defense counsel had fabricated evidence, and the latter suggested that the jurors were not permitted to take a different view of the evidence than the one proposed by the prosecution.  Id.

Nonetheless, the SJC concluded that these two "unfortunate" remarks did not warrant a new trial.  Id. Considering the trial as a whole, the judge's two curative instructions, and the strength of the evidence the Commonwealth presented against Taylor, the improper prosecutorial statements did not justify reversal.  Id.

In August 2017, appellant filed a habeas petition in the United States District Court for the District of Massachusetts. The petition raised two claims: first, that the prosecutor's improper comments during his closing argument were so egregious that they deprived Taylor of a fair trial; second, that he received ineffective assistance of counsel because his attorney failed to address an allegation that jurors were sleeping during portions of the trial.[1]

The district court denied Taylor's petition. The court agreed with the SJC that the prosecutor had made the two improper remarks noted above. The court also agreed with the SJC that these remarks did not warrant a new trial because (1) "a court should not infer that the jury will draw the most damaging meaning from an isolated remark after sitting through a lengthy trial and jury instructions," (2) "much of the objectionable content was made in response to the opening argument of the defense," (3) the trial judge gave curative jury instructions, and (4) "the weight of the evidence against the petitioner was strong." 381 F. Supp. 3d at 118. The court also rejected

---

[1] A year after the SJC decision, Taylor filed a second motion for a new trial, arguing that his counsel was ineffective because he did not address the fact that jurors were asleep during the trial. His second motion was denied by the Superior Court, and that decision was affirmed by the Appeals Court and the SJC.

Taylor's ineffective assistance of counsel claim regarding the sleeping jurors.  Id. at 117.

The district court issued a certificate of appealability as to both claims.  On appeal, Taylor dropped his claim regarding the sleeping jurors, and he thus proceeds solely on his claim that improper statements by the prosecutor denied him due process in violation of the federal Constitution.  The Commonwealth argues that the SJC reasonably found that the challenged statements did not warrant habeas relief.

**II.**

**A. Habeas Standard of Review**

We review de novo a district court's denial of a petition for a writ of habeas corpus.  Linton v. Saba, 812 F.3d 112, 121 (1st Cir. 2016).  Under AEDPA, habeas relief may be granted if a state court's adjudication of a claim on the merits "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court."  28 U.S.C. § 2254(d)(1).

Here, the second prong, an unreasonable application of the law, is at issue. "An unreasonable application occurs when 'the state court identifies the correct governing legal rule[,] . . . but unreasonably applies it to the facts of the particular state prisoner's case.'"  Bebo v. Medeiros, 906 F.3d 129, 134 (1st Cir. 2018) (quoting White v. Woodall, 572 U.S. 415, 425

(2014) (omission in original)). To meet this standard of unreasonableness, a state court's application of the law "must be 'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." White, 572 U.S. at 419 (quoting Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003)). The writ can only be granted "in cases where there is no possibility fairminded jurists could disagree" that the state court's application of the law to the facts of the case was unreasonable. Harrington v. Richter, 562 U.S. 86, 102 (2011).

**B. Clearly Established Law Regarding Improper Prosecutorial Statements**

The clearly established law of the Supreme Court for evaluating the import of improper statements by prosecutors and the fairness of a trial is undisputed: a new trial is warranted if improper statements "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)); see, e.g., Dorisca v. Marchilli, 941 F.3d 12, 23 (1st Cir. 2019) (citing Darden as the clearly established law for purposes of deciding an AEDPA petition).

To reasonably apply the Darden standard, a state court must assess the propriety of each of the allegedly improper prosecutorial statements. See Darden, 477 U.S. at 180 (listing

- 9 -

certain statements the prosecutor made in his closing argument and declaring that "[t]hese comments undoubtedly were improper" before beginning the due process analysis). Importantly, a finding that a statement was improper does not mean that there was a due process violation warranting a new trial. Darden, 477 U.S. at 181 ("[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned." (quoting Darden v. Wainwright, 699 F.2d 1031, 1036 (11th Cir. 1983)) (internal quotation marks omitted)). The identification of improper statements is a necessary prelude to the Darden due process analysis.

The Supreme Court has emphasized that "the Darden standard is a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations.'" Parker v. Matthews, 567 U.S. 37, 48 (2012) (per curiam) (omission in original) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). This case-by-case analysis requires courts to consider improper prosecutorial statements in context. See Darden, 477 U.S. at 179. Among the factors the Court used in Darden to evaluate the context were the severity of the improper statements, whether the statements were invited by defense argument, whether the trial judge issued appropriate curative instructions, and the weight of the evidence against the petitioner. See id. at 182.

The SJC evaluated Taylor's prosecutorial misconduct claim under Massachusetts state law, which requires courts to "assess the prosecutor's remarks 'in light of the entire argument, as well as in light of the judge's instructions to the jury and the evidence at trial.'" Taylor, 14 N.E.3d at 965 (quoting Commonwealth v. Burgos, 965 N.E.2d 854, 870 (Mass. 2012)). This approach is consistent with Darden. See, e.g., Dagley v. Russo, 540 F. 3d 8, 17 (1st Cir. 2008) ("The SJC's approach in addressing Dagley's claim [relying on Massachusetts state law] was similar in substance to the approach taken by the Supreme Court[.]"). Taylor does not contest the legal rule the SJC applied to the fundamental fairness question. Rather, he contests the SJC's application of that rule.

## III.

The allegedly improper prosecutorial remarks challenged by Taylor can be grouped into three categories: (1) attacks on defense counsel and the defense's theory of the case; (2) a statement of personal opinion as to the strength of the evidence; and (3) implicit comments on Taylor's decision not to testify.

In our assessment of the reasonableness of the SJC's application of the clearly established law of the Supreme Court to each statement, we acknowledge that "[t]he line separating acceptable from improper advocacy is not easily drawn; there is

often a gray zone." <u>United States</u> v. <u>Young</u>, 470 U.S. 1, 7 (1985). But there are nonetheless limits as to what a prosecutor may say to a jury.  We are guided by the Court's oft-quoted admonition that a prosecutor

> may prosecute with earnestness and vigor -- indeed, he should do so.  But, while he may strike hard blows, he is not at liberty to strike foul ones.  It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

<u>Berger</u> v. <u>United States</u>, 295 U.S. 78, 88 (1935).

## A.  Alleged Attacks on Defense Counsel and the Defense Theory

In discussing the language to which Taylor objects, we include both the particular phrases he challenges as improper -- which are underlined -- and any surrounding sentences we view as necessary for understanding the context of the allegedly improper remarks.[2]

### 1. "Bald-face Lie"

> And, finally, in the most provocative claim that was made, and one that was repeated throughout this trial and throughout [defense counsel's] closing argument, is that Martin McCray is the killer. . . .  <u>To call that a rumor, to call that speculation, to call that innuendo, is to give that statement too much credit.  That is a bald-face lie.</u>  There is not a single shred of evidence in this case, not one, that even suggests that Martin McCray killed Dominique

---

[2] We similarly provide the surrounding comments for the other two categories of challenged comments.

Samuels. . . . And the fact of the matter is that [defense counsel's] entire argument is based on that proposition, a proposition that is simply untrue.

The SJC found the prosecutor's use of the phrase "bald-face lie" to be "ill-advised." 14 N.E.3d at 966. The district court similarly noted that this statement was "inappropriate." 381 F. Supp. 3d at 118. The district court correctly determined that the SJC's decision was a reasonable application of clearly established federal law, as determined by the Supreme Court. See Young, 470 U.S. at 9 ("[Counsel] must not be permitted to make unfounded and inflammatory attacks on the opposing advocate."); cf., e.g., United States v. Xiong, 262 F.3d 672, 675 (7th Cir. 2001) (noting that accusations that defense counsel is lying may "direct[] the jury's attention away from the legal issues[,]. . . induc[e] the jury to give greater weight to the government's view of the case[,]. . . [or] caus[e] the jury to believe that the defense's characterization of the evidence should not be trusted"). Indeed, although the prosecutor certainly may argue the plausibility of the defendant's theory of the case, the SJC appropriately observed that "a prosecutor treads on dangerous ground when he can be seen as accusing defense counsel of engaging in fabrication." 14 N.E.3d at 366.

## 2. "You will have violated the oath that you took as jurors"

> But the one thing you must do, the one thing that you are required to do is that if you are going to make a determination about the credibility of a witness, you must do so with the evidence.  If you decide not to believe Martin McCray, that is your right.  But <u>if you don't believe Martin McCray because you think he killed Dominique Samuels, I suggest to you, ladies and gentlemen, you will have violated the oath that you took as jurors . . . to decide this case . . . upon the evidence.</u>[3]

The SJC found that the prosecutor's comment regarding the jury's oath was improper because it

> could have been misunderstood by the jury to mean that they were not permitted to take a different view of the evidence or credit a theory of Martin's guilt without violating their oaths.  Prudence counsels against invocation of the jurors' oath in this fashion.

14 N.E.3d at 966.  The district court also characterized the prosecutor's suggestion that "you will have violated the oath that you took as jurors" as "inappropriate."  381 F. Supp. 3d at 117.

This reference to the jury's oath was undisputedly improper under clearly established federal law as determined by the Supreme Court.  In <u>Young</u>, the Court stated that a

---

[3]  Where the ellipses appear, Taylor's defense counsel was interjecting objections.

- 14 -

prosecutor's exhortation to the jury that "I don't think you're doing your job as jurors [if you acquit,]," 470 U.S. at 5-6, was a "kind of pressure . . . [that] has no place in the administration of criminal justice," id. at 18. Similarly, the Court has acknowledged that a prosecutor is making an impermissible emotional appeal if she suggests that jurors have a civic duty to convict. See Viereck v. United States, 318 U.S. 236, 247-48 & n.3 (1943); United States v. Kinsella, 622 F.3d 75, 85 (1st Cir. 2010) (citing Viereck for this proposition).

**3. Other Alleged Improper Attacks on the Defense Theory and Defense Counsel**

Taylor challenges two additional statements as attacks on the defense theory: (1) a characterization of the defense's theory as "fantastic" and "outlandish[,]" and (2) a description of the defense's theory as a "path of speculation, of cynicism, and innuendo." Taylor also challenges the description of the defense counsel's cross-examination of Martin McCray as "accusatory, rude, and disrespectful, and at times vulgar" as a personal attack on defense counsel.

The SJC briefly stated in a footnote that these statements were not improper.[4] This was a reasonable application

---

[4] The full footnote, which also addressed other challenges to the prosecutor's comments, see infra, is as follows: "The defendant also objects to what he terms the prosecutor's improper reference to his personal opinion, his comment allegedly regarding the defendant's decision not to take the stand, and

of clearly established federal law as determined by the Supreme Court. See Berger, 295 U.S. at 88 (noting the leeway afforded prosecutors to vigorously advocate for a conviction). Reflecting the Court's view of permissible advocacy by government counsel, our court has acknowledged that prosecutors must be given "some latitude 'to discuss competing inferences from the evidence on the record,' and 'to comment on the plausibility of the defendant's theory.'" United States v. Berroa, 856 F.3d 141, 161 (1st Cir. 2017) (quoting United States v. Glover, 558 F.3d 71, 77-78 (1st Cir. 2009)). The prosecutor's characterizations of the defense's theory in this case fell within that leeway. See Glover, 558 F.3d at 78 (noting that the court had previously found acceptable a prosecutor's statement that the defense's theory was "absurd").

As for the prosecutor's description of defense counsel's cross-examination of McCray, the "alternate suspect," it included poorly chosen words: "rude," "disrespectful," and "vulgar." These words were "undignified and ill-chosen for a professional who is bound by the rules of civility and proper court decorum." United States v. Davis, 15 F.3d 1393, 1402-03 (7th Cir. 1994). Nonetheless, in the context of Taylor's trial,

---

his disparagement of defense counsel. As to these statements, we agree with the panel of the Appeals Court that there was no error." Taylor, 14 N.E.3d at 966 n.18.

the prosecution faced an unusual circumstance -- the need to rehabilitate the testimony of a crucial witness who appeared to have an emotional breakdown during defense counsel's vigorous cross-examination. Under this circumstance, and consistent with clearly established Supreme Court law, the SJC reasonably concluded that the prosecutor's harsh characterization of defense counsel's cross-examination was not an improper personal attack on defense counsel.

## B. The Prosecutor's Expression of a Personal Opinion

Taylor claims the following statement constituted an improper expression of the prosecutor's personal opinion:

> That bloodstain on the back of the television, an arm's length from the bloodstain on the floor, a bloodstain that belongs to Dominique Samuels. The bloodstain that the defendant tried to clean up. An arm's length away, the defendant's blood and the victim's blood. <u>It doesn't get any better than that</u>.

Without elaboration, the SJC stated that the remark "It doesn't get any better than that" was not improper. <u>Taylor</u>, 14 N.E.3d at 966 n.18. This judgment was a reasonable application of Supreme Court law. The Court forbids expressions of the prosecutor's personal opinion on "the truth or falsity of any testimony or evidence or the guilt of the defendant." <u>Young</u>, 470 U.S. at 8 (quoting ABA Standards for Criminal Justice 3-5.8(b)(2d ed. 1980)). But the SJC could reasonably conclude

- 17 -

that this comment was not a personal opinion as to the truth of the evidence, but rather an observation that a certain type of evidence is particularly probative of guilt. The SJC's determination that the statement was not improper was thus a reasonable application of Supreme Court law. Cf. United States v. Andreas, 216 F.3d 645, 671-72 (7th Cir. 2000) (concluding the trial court did not abuse its discretion by finding that the prosecutor's statement that "you can't get better evidence than that" was not improper because it was not unreasonable to allow a prosecutor to comment on the persuasiveness of certain "types of evidence").

## C. Alleged Comments on the Failure to Testify

It is a bedrock principle of constitutional law that a prosecutor is not permitted to comment on the defendant's exercise of his Fifth Amendment right to silence. See, e.g., Griffin v. California, 380 U.S. 609, 615 (1965). A prosecutor's statements violate the Fifth Amendment if "the language used was manifestly intended or was of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." United States v. Wilkerson, 411 F.3d 1, 9 (1st Cir. 2005) (quoting United States v. Wihbey, 75 F.3d 761, 769 (1st Cir. 1996)).

In his brief to this court, Taylor argues that two of the prosecutor's statements improperly commented on his failure

- 18 -

to testify.  However, as the government argues, one of those statements was not challenged in the state court proceedings.[5] That claim of error is therefore not exhausted, and, accordingly, we may not consider it.  See 28 U.S.C. § 2254(b)-(c).

The other comment is as follows:

> [Defense counsel] says I can't tell you that [the cell phone evidence] means he was in Franklin Park.  I'm not saying he was in Franklin Park.  <u>I have no idea where he was when he made those calls.  Nobody does except for the defendant.</u>  But the cell phone records prove something: he wasn't in Norwood.  He was not in Norwood as [his attorney] claimed he would be.

Part of Taylor's defense was that he was in a different city (Norwood) at the time the victim's body was burned at Franklin Park.  Thus, the prosecutor was observing that, even though the evidence was not conclusive as to Taylor's exact location at the time the victim's body was burned, the records indicated he was not in Norwood as his attorney claimed.

Again without elaboration, the SJC disposed of this failure to testify issue in the same brief footnote quoted above,

---

[5] The unchallenged statement was the following: **"And not one witness in this case puts the defendant at Martha Laing's house, not one, not any of the witnesses [defense counsel] called.  Marie Anderson doesn't say that. Martha Laing doesn't say that.  <u>And you know who else doesn't say that? The defendant doesn't say that</u>."**  Although the district court analyzed this statement on the merits, finding that it did not implicate Taylor's Fifth Amendment rights, it was not properly before the court.

finding no impropriety. The district court agreed with this finding, concluding that the prosecutor's statement is more naturally understood as a comment on the evidence, rather than as a comment on Taylor's decision not to testify. As the district court explained:

> When read in the context of the entire statement, the prosecutor was referring to evidence which indicated that Taylor's cell phone was not located where he claimed he was when the victim's body was being disposed of. A prosecutor is entitled to use the evidence to undermine the defense's theory.

381 F. Supp. 3d at 119.

We concur in this assessment of the SJC's finding. A prosecutor is entitled to comment on the plausibility of the defense theory if those comments are "aimed at the evidence, rather than at the defendant." United States v. Akinola, 985 F.2d 1105, 1111-12 (1st Cir. 1993) (finding no error in prosecutor's statement at closing argument that certain facts were "unexplained"). The prosecutor's comment was appropriately targeted at the evidence (and lack thereof), rather than Taylor's failure to testify. Accordingly, the SJC reasonably applied clearly established Supreme Court law affording prosecutors flexibility "to use every legitimate means to bring about a just" conviction. Berger, 295 U.S. at 88.

- 20 -

## D. Fundamental Fairness

As we have now explained, the SJC reasonably applied clearly established federal law as determined by the Supreme Court in concluding that the prosecutor made two improper statements: accusing defense counsel of a "bald-face lie" and stating that the jurors would be violating their oaths if they believed defense counsel.  According to Darden, the effect of the improper statements on the fundamental fairness of the trial is to be assessed by examining the statements in context, thereby considering factors that would minimize their impact, including the corrective instructions of the judge and the strength of the evidence against the defendant.  See Darden, 477 U.S. at 182; see also Hardy v. Maloney, 909 F.3d 494, 501 (1st Cir. 2018) (applying this standard in the context of AEDPA review).  Darden does not require a court to consider any precise combination of factors in the fundamental fairness analysis.  See Parker, 567 U.S. at 48 (referring to "[t]he highly generalized standard for evaluating claims of improper prosecutorial statements set forth in Darden").

Here, the SJC focused on curative jury instructions and the strength of the evidence.  Directly following an objection to the prosecutor's statement regarding the jurors' oath, the judge told the jury, "The jurors will make their decision, as has been stated, from the evidence and the evidence

only.  That's what controls."  The closing jury instructions included the following:

> [I]n the context of his argument regarding your evaluation of the credibility of Martin McCray's testimony, [the prosecutor] stated that if you don't believe Martin McCray because you think he killed Dominique Samuels, you will have violated your oaths you took as jurors.  I want to be sure that you understand that as [the prosecutor] stated, both before and after the statement I just referred to, your judgment of the credibility of Martin McCray's testimony and all other witness[es] in this case must be based solely upon the evidence presented at trial.  I will be defining evidence for you in these instructions.  You will have followed your oath as jurors when you have made your credibility determinations based on the evidence, whatever those determinations turn out to be.

> [Y]ou and you alone determine what the facts are.  In a sense, you are the judges when you do that.  You are the sole judges of the facts.  It does not matter what I or the attorneys think the facts are; all that matters is what you find facts to be. . . . You alone determine the weight and the effect and the value of the evidence and the credibility, that is, the believability of the witnesses.

> The personal belief[s] [of] counsel on any issue in the case or what the evidence is are not evidence.

The SJC found that these instructions "sufficed to 'mitigate any prejudice in the final argument'" because they appropriately "direct[ed] the jury to reach their decision based on the evidence before it."  Taylor, 14 N.E.3d at 966.  Notably, these

- 22 -

jury instructions mirror the instructions that the Supreme Court found to have a mitigating effect in Darden. 477 U.S. at 182 (listing the trial court's instructions to the jurors "that their decision was to be made on the basis of the evidence alone, and that the arguments of counsel were not evidence" as a reason why the trial was not fundamentally unfair).

The SJC also considered the strength of the evidence as part of its determination of whether the improper statements rendered Taylor's trial fundamentally unfair. The court stated:

> [T]hroughout this nearly eight-week trial, the Commonwealth presented a substantial case against the defendant, including forensic evidence corroborating his presence at the site of the victim's death and testimony that he had confessed to strangling the victim.

Taylor, 14 N.E.3d at 966. This consideration of the strength of the evidence is consistent with the Darden court's assessment that "the 'overwhelming eyewitness and circumstantial evidence to support a finding of guilt on all charges,' reduced the likelihood that the jury's decision was influenced by argument." Darden, 477 U.S. at 182 (citation omitted) (quoting Darden v. State, 329 So. 2d 287, 291 (Fla. 1976)).

In its dispositive statement on fundamental fairness, the SJC concluded: "In light of the Commonwealth's strong case and the judge's curative instructions, the prosecutor's 'fleeting' comments cannot reasonably be thought to have affected

the jury's careful deliberations."  _Taylor_, 14 N.E.3d at 966.  This conclusion that the **"bald-face lie"** and **"oath as jurors"** statements did not render the appellant's trial fundamentally unfair, and hence violative of due process, was a reasonable application of clearly established federal law as determined by the Supreme Court.  _See_ _Darden_, 477 U.S. at 181-83.  Thus, we _affirm_ the district court's denial of Taylor's petition for a writ of habeas corpus.

_So ordered._